**FIRST FEDERAL LINCOLN BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–518C.**

United States Court of Federal Claims.

Nov. 19, 2002.

Edward L. Lublin, Dyer, Ellis and Joseph, Washington, DC, attorney of record for plaintiff. With him on the briefs were Lawrence S. Scher and Alex Blanton. Michael Joseph, Dyer, Ellis and Joseph, Washington, DC, argued for plaintiff.

Gary Dernelle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, attorney of record and argued for defendant. With him on the briefs were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director. William Kanellis, of counsel.

## OPINION

WILSON, Judge.

This *Winstar*-related case is before the Court on "short form"[1] cross-motions for partial summary judgment on plaintiff's breach of contract claim. Based on the existence of genuine issues of material fact regarding intent to contract, the parties' cross-motions for partial summary judgment are DENIED.

## I. BACKGROUND

This case is one of approximately 120 cases related to *United States v. Winstar Corp., et al.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The history of the 1980s' demise of the savings and loan industry has been extensively detailed in the Supreme Court's *Winstar* decision, and is not recounted here.

Plaintiff First Federal Lincoln Bank (Lincoln), is a federally-chartered mutual savings bank based in Lincoln, Nebraska, and operating in Nebraska, Iowa, and Kansas.[2] The alleged breach of contract arises out of Lincoln's acquisition of three savings and loan associations in 1982: Great Plains Federal Savings and Loan Association of Falls City, Nebraska (Great Plains), Tri–Federal Savings and Loan Association of Wahoo, Nebraska (Tri–Federal), and Norfolk First Federal Savings and Loan Association of Norfolk, Nebraska (Norfolk). According to plaintiff, the three acquisitions resulted in combined goodwill of approximately $41 million. All three transactions were "unassisted"; in other words, the government did not provide cash assistance for Lincoln to acquire the three thrifts.

Plaintiff alleges that pursuant to contractual agreements with the FHLBB, all three acquisitions were permitted to utilize purchase accounting and amortize goodwill over twenty-five years. Plaintiffs contend that the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464(t)(1)), breached plaintiff's contractual agreement regarding the treatment of goodwill for regulatory capital compliance purposes for a specified amortization period.[3]

The government contends that Lincoln did not contract with the FHLBB for any accounting treatment not otherwise available under generally accepted accounting principles (GAAP). According to defendant, the government's approval of the merger agree-

---

1. "Short-form" motions for summary judgment on liability for breach of contract were permitted under the *Winstar* Omnibus Case Management Order of September 18, 1996.

2. During the time period of greatest relevance to this case, Lincoln was First Federal Saving and Loan Association of Lincoln. It was renamed First Federal Lincoln Bank in 1995. Subsequently, in 2002, it was renamed TierOne Bank.

3. According to plaintiff, none of the thrifts were seized as a result of the passage of FIRREA and the elimination of Lincoln's ability to count the unamortized amount of approximately $22.5 million of unamortized goodwill as an asset for regulatory purposes did not hamper Lincoln's ability to meet all regulatory capital requirements. (Compl.¶¶ 7, 9, 94.)

ment constituted a regulatory act rather than a bargained for contractual agreement that protected plaintiff from the risk of future statutory or regulatory changes.

### A. *The Great Plains Acquisition*

Great Plains was a federally-chartered mutual savings and loan association headquartered in Falls City, Nebraska. In the early 1980s, Great Plains suffered financial losses that threatened it with insolvency. Great Plains' accountant, Touche Ross & Co., informed management that as of September 30, 1981, Great Plains' "net worth ha[d] fallen below prescribed minimum requirements ... and [Great Plains might] be subject to legal or administrative actions by the Federal Home Loan Bank Board (FHLBB or Bank Board)." (Joint Appendix Regarding Unassisted Transactions (J.A.), Tab 5.) Touche Ross advised Great Plains to seek a merger in order to avoid insolvency.

By October 1981, Lincoln and Great Plains had entered into formal merger negotiations. The parties reached an agreement in principle on December 8, 1981, which was unequivocally conditioned on "the Federal Home Loan Bank Board's acceptance of the 'Purchase Accounting' method that will be utilized in the final consummation of the merger" and "amortization of goodwill over a minimum of 30 years."[4] (J.A., Tab 8.) A definitive merger agreement was executed on December 16, 1981. The merger agreement contained specific language incorporating the December 8, 1981

letter of agreement in principle. (J.A., Tab 9.) The execution of the agreement was conditioned upon FHLBB approval, pursuant to the requirements of 12 C.F.R. § 546.2 (1982) (repealed). Lincoln submitted the proposal to merge with Great Plains to the FHLBB on December 31, 1981.

Prior to final approval of the Great Plains merger, FHLBB representatives exchanged numerous internal memoranda regarding the issue of amortization of goodwill. The FHLBB was unwilling to allow Lincoln to amortize the goodwill of the Great Plains acquisition over thirty years. A March 12, 1982 internal memorandum from the Principal Supervisory Agent (PSA) to the Director of Office of Industry Development recommended approval of the merger with Great Plains and noted that accounting would utilize the purchase method in accordance with GAAP. (J.A., Tab 10.) In a March 24, 1982 letter from a Touche Ross representative to Lincoln about this issue, the Touche Ross representative reported that the Office of Examination and Supervision (OES) had indicated that the FHLBB would demand a shortened amortization period of twenty-five-years, rather than the requested thirty-years, in order to ensure that all mergers would be approved in "a uniform manner." (J.A., Tab 11.)

A March 30, 1982 internal memorandum from the FHLBB to the PSA agreed with the independent accountant's assessment that purchase accounting was appropriate in the Great Plains transaction, but stated that,

---

4. At the time of Lincoln's acquisitions, FHLBB accounting policies allowed thrifts to account for mergers and acquisitions in conformity with generally accepted accounting principles (GAAP). GAAP permitted two methods of accounting for mergers and acquisitions—the "pooling of interest" and the "purchase of assets." The "pooling" method has the assets and liabilities of two entities combined at their book value. This method recognizes that two separate businesses are combined and future operating results are based on the original amounts of the respective assets and liabilities. In comparison, the "purchase" method revalues the assets and liabilities of the acquired entity from their original book value to their market value at the time of the acquisition and recorded upon the books of the acquiring institution at those market values, also referred to as "marked to market." Accordingly, the fair values of all assets and liabilities ac-

quired are determined as of the merger date and are used to allocate the purchase price. Any excess of the purchase price over the net fair value of all identifiable assets acquired and liabilities assumed is assigned to "goodwill" an intangible asset reflecting the advantages the acquiring institution receives from newly added customers, a larger deposit base, and exposure to a broader market. The length of time that goodwill is amortized reflects how long the acquiring institution will accrue these intangible benefits. *Winstar*, 518 U.S. at 852–54, 116 S.Ct. 2432; *see also* (Def.'s App. in Support of its Supp. Cross–Mot. for Summ. J. (Def.'s App.), Tab 14; Pl.'s App. in Support of its Short–Form Motion (Pl.'s App.), Tab 15). For acquiring institutions like Lincoln, the treatment of goodwill in its mergers was especially important because it counted against federal capital requirements.

in order to grant approval of the merger, the amortization period would have to be modified—"this office would not take exception to the amortization of all intangibles over 25 years on a straight line method," and until modified, "this office cannot approve the accounting treatment of the merger." (J.A., Tab 12.) The amortization period discussion was continued in an April 6, 1982 internal memorandum sent from the Regional Director of the FHLBB to an Office of Industry Development representative. Recognizing that Great Plains' projected insolvency date was January 1983, and Lincoln's own insolvency was predicted to occur in March 1984, the Regional Director recommended conditioning the Great Plains' merger approval on Lincoln's acceptance of amortization of intangible assets over twenty-five, not thirty years, as originally proposed. (J.A., Tab 13.) Subsequently, Lincoln agreed to the twenty-five-year amortization of goodwill on a straight-line basis.

The record also suggests that forbearance from regulatory capital requirements was the subject of discussion between the parties and within the government. An April 14, 1982 memorandum from the PSA to the FHLBB Regional Director advised that an impasse had been reached on the proposed merger and noted that the

> main stumbling block involved a recent accounting interpretation which stated that estimated loan prepayments must be adjusted annually to reflect prepayment experience .... These potential losses have made First Federal Lincoln less willing to risk the uncertainty of actual prepayments of mortgages in calculating the benefit of purchase accounting for this merger.

(J.A., Tab 14.) In order to facilitate the merger agreement, the PSA recommended granting Lincoln's request for forbearance with respect to meeting regulatory capital requirements for five years.

The FHLBB issued Resolution 82–322 on May 5, 1982, approving the Great Plains transaction on the condition that Lincoln submit a letter from its independent accountant regarding the amount and treatment of "intangible assets, including goodwill" generated by the acquisition. (J.A., Tab 18.) In

conjunction with the resolution, the FHLBB issued a regulatory forbearance letter the same day, granting Lincoln regulatory net worth forbearance to help alleviate some of the financial concerns noted in the April 14 memorandum. The forbearance letter provided:

> For a period of five years, following the effective date of the merger, the Board will forbear from exercising its authority under § 563.13 of the Rules and Regulations for Insurance Accounts because of the failure of the resulting association to comply with the statutory reserve and net worth requirements of § 563.13 to the extent that such failure results from the inclusion of scheduled items in existence resulting from the loan portfolio of Great Plains at the effective date of the mergers.

(J.A., Tab 17.) On June 14, 1982, Lincoln's accountant submitted a letter declaring that Lincoln would book approximately $19.81 million of goodwill to be amortized over twenty-five years. (J.A., Tab 21 at PL0040.) The FHLBB subsequently informed Lincoln on June 23, 1982 that the material conditions of the merger had been fulfilled. (J.A., Tab 22.)

Plaintiff asserts that Great Plains' net worth was negative $827 thousand on total assets of approximately $64.5 million at the time of acquisition. If those assets were "marked to market," Great Plains' liabilities would have exceeded its assets by $20 million, placing it in immediate regulatory non-compliance with the capital requirements and rendering Great Plains insolvent.

### B. *The Tri–Federal Acquisition*

Tri–Federal was a federally-chartered mutual savings and loan association headquartered in Wahoo, Nebraska. On February 16, 1982, David A. Douglass of the Federal Home Loan Bank of Topeka, Kansas (FHLB–Topeka) wrote to Tri–Federal's Board of Directors, warning that "[a]t the present rate of operating losses, the association's net worth will be depleted in early 1983." (J.A., Tab 26.) Douglass encouraged the thrift to seek "merger with an association in Nebraska with the financial capacity to continue ... operations." *Id.* Tri–Federal

and Lincoln reached an agreement in principle on March 23, 1982. As with the Great Plains letter of agreement in principle, Lincoln indicated in its letter to Tri–Federal that the terms and conditions of the merger were subject to the FHLBB's acceptance of purchase accounting and the amortization of resulting goodwill over "a minimum of 30 years." (J.A., Tab 27.) A definitive merger agreement was signed on April 15, 1982. Unlike the Great Plains merger agreement, Tri–Federal's agreement did not incorporate by reference the letter of agreement in principle. However, the merger agreement was conditioned on FHLBB approval and "the satisfactory utilization of the 'Purchase Method' to account for the merger." (J.A., Tab 28.) On April 30, 1982, Lincoln submitted an application for merger with Tri–Federal to the Bank Board. The merger application included the letter of agreement in principle (Part I), the merger agreement (Part II), and financial data including a footnote stating that $6,863,000 of goodwill would be amortized over twenty-five years (Part IV). (J.A., Tab 30 at PFL–009 1151, PFL–009 1155.)

A June 21, 1982 internal memorandum from the Supervisory Assistant to the PSA recommended approving the merger. The Supervisory Assistant indicated that Tri–Federal's projected insolvency date would be August 1983 and that the merger would be accounted for using the purchase method. (J.A., Tab 31.) Accordingly, the FHLBB issued a conditional letter of approval on June 24, 1982. (J.A., Tab 32.) As with the Great Plains transaction, the approval was conditioned, among other things, upon the FHLBB's receipt of an opinion letter from Lincoln's independent accountant discussing Lincoln's use of purchase accounting for the merger. Lincoln subsequently submitted materials to satisfy those conditions, including a financial statement establishing that $8,570,577.44 of goodwill would be amortized over twenty-five years on a straight line basis.[5] (J.A., Tab 33 at n. 4.) On August 16, 1982, FHLB–Topeka acknowledged that Lincoln had fulfilled the conditions of the merger. (J.A., Tab 34.)

## C. *The Norfolk Acquisition*

Norfolk was a federally-chartered mutual savings and loan association headquartered in Norfolk, Nebraska. Like Great Plains and Tri–Federal, Norfolk's financial situation was deteriorating due to the high cost of funds in the early 1980s. Lincoln and Norfolk entered into merger negotiations, which resulted in an agreement in principle on May 7, 1982. The Norfolk agreement in principle differed slightly from those in the Great Plains and Tri–Federal transactions in that the merger was conditioned on amortization of goodwill "over a minimum of 25 years." (J.A., Tab 37.) A definitive merger agreement was reached May 18, 1982, and as with the other two mergers, the transaction was conditioned upon FHLBB approval and satisfactory utilization of purchase accounting. (J.A., Tab 38.) The Norfolk merger agreement did not specifically incorporate by reference the letter of agreement in principle.

On June 21, 1982, Lincoln submitted its application to merge with Norfolk to the FHLBB. The merger application was conditioned upon the use of purchase accounting, a twenty-five-year or longer amortization of approximately $14.6 million in goodwill, and FHLBB approval. (J.A., Tab 40.) These conditions of merger were reiterated in an internal FHLBB memorandum from the Supervisory Assistant to the Director of Division of Industry Development representing that Norfolk was projected to become insolvent in September 1983. The memorandum also advised that purchase method accounting would be used, generating goodwill that would be amortized over 25 years. (J.A., Tab 42.)

The Principal Supervisory Agent of FHLB–Topeka approved the Norfolk acquisition on August 23, 1983. As with Lincoln's prior acquisitions, the Bank Board required Lincoln to submit a letter from its independent accountant discussing the accounting of

5. According to the affidavit of Charles H. Thorne, then President of Lincoln (Pl.'s App., Tab 5), the accounting for the Tri–Federal merger would be "treated in the same manner as the goodwill created in the Great Plains Transaction." Lincoln did not, however, receive any net worth forbearance with respect to the Tri–Federal (or Norfolk) acquisition.

the merger. (J.A., Tab 43.) Lincoln submitted this letter on October 7, 1982, and reported that it would record approximately $12.5 million of goodwill from the merger. (J.A., Tab 46, at n. 6 (stating that Norfolk's goodwill will be amortized over twenty-five years under the straight-line method of amortization).) FHLB–Topeka acknowledged that Lincoln had fulfilled all necessary conditions of the merger on October 13, 1982. (J.A., Tab 47.)

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.,* 287 F.3d 1108, 1113 (Fed.Cir.2002). The Court does not "weigh" each side's evidence when adjudicating a motion for summary judgment. *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). Instead, "the Court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed.Cir.2002). When both parties move for summary judgment, the Court must evaluate each motion on its own merits. *Pickholtz v. Rainbow Techs., Inc.,* 284 F.3d 1365, 1371 (Fed.Cir.2002). The Court can deny both cross-motions if disputes remain over material facts. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). In the absence of factual disputes, the question of contract formation is a question of law amenable to resolution by summary judgment. *Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002).

### B. *Contract Formation*

In deciding *Winstar*-related cases, the Supreme Court directed courts to apply "ordinary principles of contract construction and breach that would be applicable to any contract between private parties." *Winstar,* 518 U.S. at 871, 116 S.Ct. 2432. "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.1999). These general requirements apply equally to express and implied contracts.[6] *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir. 1997).

Expanding upon the Supreme Court's holding in *Winstar,* the Federal Circuit in *California Federal Bank, FSB v. United States (CalFed),* 245 F.3d 1342 (Fed.Cir. 2001), held that a contract can exist between the government and a financial institution without an assistance or supervisory action agreement. According to the Federal Circuit:

> [I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and FHLBB resolutions confirm that intent, the absence of an assistance agreement or supervisory action agreement should be irrelevant to the finding that a contract existed.

*CalFed,* 245 F.3d at 1346–47.

In *CalFed v. United States,* 39 Fed.Cl. 753, 773 (1997), this Court noted, and the Federal Circuit affirmed, that "[c]ontracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in logical sequence." Regulatory documents can be construed as

---

**6.** An "implied-in-fact" contract is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923).

contractual agreements if the reality of a transaction favors such an interpretation. *Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 264, 274 (2002). However, the burden of proving that the reality of the transaction is a contractual undertaking, as opposed to regulatory practice, remains with the plaintiff. *First Commerce Corp. v. United States,* 53 Fed.Cl. 38, 43 (2002). If the contract terms are ambiguous, and require examination of external evidence, the matter is not appropriate for summary judgment. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988). Whether the FHLBB's approval of the three Lincoln acquisitions gave rise to a contract between the government and Lincoln depends on "all the facts and circumstances" surrounding the acquisitions. *Advance Bank, FSB v. United States,* 52 Fed.Cl. 286, 288 (2002).

The Court is presented with numerous documents which plaintiff contends support the existence of contracts with the FHLBB. In consideration for acquiring three failing thrifts, plaintiff argues that it received the benefit of the use of purchase method accounting, and permission to amortize the resulting goodwill over twenty-five years (originally proposed for a thirty-year period). According to plaintiff, a contractual agreement between Lincoln and the FHLBB is memorialized by the three merger agreements, agreements in principle, merger applications, the FHLBB resolution, Lincoln's independent accountant opinion letters from Touche Ross & Co., approval and forbearance letters from the FHLBB, and internal FHLBB memoranda recommending and confirming approval of each of the three transactions. Defendant argues that these documents illustrate nothing more than routine regulatory approval of three mergers between private parties.

### Authority

■ As a preliminary matter, the government argues that the PSA lacked authority to bind the government in contract with Lincoln. In order for plaintiff to prove the existence of a contract with the United States, it must demonstrate that the PSA had actual authority to bind the United States. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997). Actual authority can be either express or implied in fact. *See H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). "Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms." *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001); *Roy v. United States,* 38 Fed.Cl. 184, 188 (1997). "Actual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.'" *Roy,* 38 Fed.Cl. at 189 (quoting *Landau,* 886 F.2d at 324).

The government relies on 12 C.F.R. § 546.2(h)(8) (1982) (repealed), which prohibited the PSA from approving a merger that involved "any agreement with the Federal Savings and Loan Insurance Corporation." The regulation explicitly limits the authority of PSAs in agreements in which the Federal Savings and Loan Insurance Corporation (FSLIC) is a party; in other words, in assisted transactions. However, the parties in this matter were involved in unassisted transactions. Thus, the three transactions in this case are not affected by the limitations addressed by 12 C.F.R. § 546.2(h)(8).

■ Moreover, as the Court noted in *Fifth Third Bank v. U.S.,* "[§ 546.2(h)(8)] cannot operate to prevent PSAs from negotiating and executing any contracts, for the 1982 delegation of authority provides PSAs express authority to enter into forbearance agreements." 52 Fed.Cl. 637, 642 (2002). In February 1982, FHLBB decided to expand the delegation of authority to PSAs to allow the PSAs to agree to certain forbearances in approving supervisory mergers. 47 Fed. Reg. 8152 (Feb. 18, 1982). Prior to the promulgation of the new regulations, FHLBB authorized the PSAs to approve mergers only. The new regulations expanded the scope of delegated authority to allow PSAs to approve merger application in which "goodwill [was] included in the assets" of a resulting merger. 47 Fed.Reg. 8152. The purpose of the Delegation of Authority was

to "facilitate successful mergers and [to serve] the interests both of the public and of the savings and loan industry." 47 Fed.Reg. 8152. According to the delegation regulations, "because of some confusion which resulted from the earlier expansion of merger approval authority with respect to supervisory forbearance, the Board ratifies all mergers which have been previously approved under delegated authority." 47 Fed.Reg. 26807 (June 22, 1982). As the Court held in *Fifth Third*, "[t]he ability of the regional banks to make promises regarding the use of supervisory goodwill therefore was integral to fulfilling their role in FHLBB's policy to encourage the private acquisition of failing thrifts." 52 Fed.Cl. at 643. In accordance with the delegation regulations, the regional bank in this case had implied authority to bind itself to promises regarding amortization and use of goodwill towards regulatory capital.

## Offer

■ Plaintiff argues that the three separate merger applications to the FHLBB constituted three separate offers. The government construes the merger applications not as contractual offers but rather as fulfillment of one of the regulatory requirements for obtaining government approval of the three transactions. The regulations required the submission of merger applications to the FHLBB, as well as a filed copy of Lincoln's merger agreement. 12 C.F.R. § 546.2(c-d). Moreover, the regulations required FHLBB approval for the acquirer to utilize the purchase method of accounting, and required the submission of specific financial data concerning goodwill and an opinion letter from the acquirer's accountant. 12 C.F.R. § 546.2(h).

Lincoln's letter of agreement in principle to Great Plains established that the "terms and conditions of this merger are subject to the Federal Home Loan Bank Board's acceptance of the 'Purchase Accounting' method that will be utilized in the final consummation of the merger... In addition, amortization of goodwill over a minimum of 30 years." (J.A., Tab 8.) The terms of the letter were then specifically incorporated by reference into the merger agreement between Lincoln and Great Plains, which was made part of the merger application. (J.A., Tab 9.) As the Federal Circuit noted in its *Winstar* decision, "[o]nce specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract, both parties were bound to them." *Winstar v. United States*, 64 F.3d 1531, 1542 (Fed.Cir.1995) (en banc). Because these key terms and conditions were part of the merger application reviewed by the FHLBB, plaintiff maintains that the FHLBB was fully aware of Lincoln's prerequisites for the Great Plains acquisition.

It is clear that the FHLBB had actual knowledge of Lincoln's intent to utilize purchase method accounting and amortize the resulting goodwill over a certain length of time. Plaintiff has provided substantial documentary evidence of the FHLBB's internal analysis of Lincoln's request for a thirty-year amortization period. Internal memoranda also memorialized the PSA's recommended approval of the Great Plains merger, recognizing that the merger would be accounted for using the purchase method. (J.A., Tab 10.) Touche Ross also indicated to Lincoln that its communication with the FHLBB revealed that the Bank Board would only permit amortization of goodwill over twenty-five years. (J.A., Tab 11.) The FHLBB's position was reiterated in an internal memorandum from the FHLBB to the PSA in which the FHLBB concurred with the PSA's recommendation that the use of the purchase method was appropriate for the Great Plains merger, but established that the amortization period would have to be shortened to twenty-five years and advised that approval of the merger could not be granted until this occurred. (J.A., Tab 12.)

The internal memoranda relied on by plaintiff document the Bank Board's recognition and consideration of Lincoln's terms and conditions of merger and the FHLBB's own internal discussions about whether to grant merger approval. This Court has found that in a regulatory environment, "negotiations can indicate that the parties are embarking on more than the ordinary course of regulations." *First Commerce*, 53 Fed.Cl. at 48. In *CalFed*, 245 F.3d at 1348, the Federal

Circuit held that the combination of merger applications, merger agreements, FHLBB resolution, FHLBB approval and forbearance letters, and internal memoranda, "demonstrate that purchase accounting and amortization of goodwill were essential terms of the negotiated transactions." Plaintiff maintains that the documentary evidence before the Court is the same as the evidence reviewed by the Court in *CalFed*, in which the Court found a contract.

Unlike the Great Plains merger agreement, the Tri–Federal and Norfolk agreements did not contain specific integration clauses. Instead, they merely made the mergers conditional upon the "satisfactory utilization of the 'Purchase Method' to account for the merger." (J.A., Tabs 28, 38.) The Great Plains merger agreement, unlike those of Tri–Federal and Norfolk, incorporated by reference, not only the necessity of utilizing the purchase method of accounting, but also the amortization of goodwill over a specific period of time. (J.A., Tab 8 at 4, Tab 9 at PFL009 0566.) Lincoln had obtained the FHLBB's approval of a thirty-year amortization period (later reduced to twenty-five) and the utilization of the purchase method of accounting before it agreed to acquire Great Plains. In contrast, no such conditions were incorporated into the Tri–Federal or Norfolk merger agreement beyond the satisfactory utilization of purchase accounting. The only reference to the twenty-five year amortization of goodwill in the Tri–Federal and Norfolk merger applications was buried within the goodwill calculations contained in their merger applications. *See* J.A., Tabs 30, 40.

Plaintiff contends that the combination of the documentary evidence with the surrounding circumstances establishes the existence of a contractual promise to utilize purchase method accounting and to allow amortization of the resulting goodwill over a specified period of time. Given the context of the savings and loan crisis of the 1980s, and the specific evidence of its own threatened insolvency, Lincoln would not have been able to avoid regulatory noncompliance or possible insolvency without this special regulatory treatment from the Bank Board.

In addition to the historical context, the internal FHLBB memoranda reflect FHLBB's acknowledgment that purchase accounting was a critical element of the three transactions. For example, internal memoranda from Ann Frigon, Supervisory Assistant to Kermit Mowbray, Principal Supervisory Agent of the FHLBB, provide synopses of the Tri–Federal (J.A., Tab 31), and Norfolk (J.A., Tab 41) mergers, clearly indicating that the acquisitions would be accounted for by the purchase method, but the length of amortization was still at issue. Specifically, the FHLBB mandated that plaintiff reduce the amortization period to twenty-five years in the Great Plains and Tri–Federal transactions. Moreover, Frigon's memorandum acknowledged that in order to delay Tri–Federal's "projected insolvency," merger with Lincoln was necessary to "resolve the problem of Tri–Federal's declining net worth position." (J.A., Tab 31.) Likewise, due to Norfolk's projected insolvency date of September, 1983, Frigon recommended approval of the Norfolk merger and advised Mowbray that the created goodwill would be amortized over twenty-five years. (J.A., Tab 42.)

The Great Plains transaction contains the most extensive documentation of the alleged contractual terms and conditions. The use of purchase accounting and amortization of goodwill were sufficiently crucial to the merger with Great Plains that Lincoln included these terms into the merger agreement by integrating the letter of agreement in principle by reference. However, at first blush, the absence of any reference to definitive amortization periods in the merger agreements of Tri–Federal and Norfolk, suggest that amortization of goodwill was not central to these two mergers, as compared to the utilization of purchase accounting, which was explicitly referenced in the applications. *See First Commerce*, 53 Fed.Cl. at 44 (finding that a general reference to goodwill within the application does not signify a request for assurances that the thrift would receive purchase money accounting treatment of goodwill); *see also Fifth Third*, 52 Fed.Cl. at 275 (distinguishing *Fifth Third* from *CalFed* by noting that the goodwill was not crucial for the plaintiff to do anything more than

submit the regulatory-required application form).

*Acceptance*

Plaintiff contends that the FHLBB's approval of the three mergers constituted acceptance of plaintiff's offers. Plaintiff asserts that because each merger was conditioned upon the FHLBB's approval of purchase accounting and a twenty-five-year amortization period of goodwill, the approval of the merger applications constituted approval of the use of purchase accounting and the amortization of goodwill.

According to the government, the purchase method of accounting could not be a negotiated term because the regulations required its use to account for these three transactions.[7] Plaintiff argues that the evidence documenting the government's acceptance is substantially the same as that presented in *CalFed.* Among other documents, plaintiff offers the Great Plains FHLBB Resolution 82–322 as evidence of the government's agreement to allow Lincoln to count goodwill toward regulatory capital because it required plaintiff in the Great Plains transaction to: "(a) specifically describe ... any intangible assets, *including goodwill* or discount arising from the merger *to be recorded* on First Federal Savings and Loan Association of Lincoln's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill and the discount of assets and the related amortization periods and methods." (J.A., Tab 18; emphasis added.) In the Great Plains merger, the FHLBB also granted Lincoln's request for certain supervisory forbearance; specifically, the FHLBB would "forbear from exercising its authority under § 563.13 of the Rules and Regulations for Insurance of Accounts because of the failure of the resulting association to comply with the statutory reserve and net worth requirements of § 563.13 to the extent that such failure results from the inclusion of scheduled items in existence or resulting

from the loan portfolio of Great Plains at the effective date of the merger" for a period of five years. (J.A., Tab 17.)

The conditional approval in the Tri–Federal merger is similar to FHLBB's conditional approval of the Standard Federal Savings and Loan Association (Standard) transaction in *Anchor Sav. Bank v. United States,* 52 Fed.Cl. 406, 417 (2002). In *Anchor,* the Standard transaction consisted of a merger agreement between Standard and Anchor, a merger application to the FHLBB, and the FHLBB's approval letter. *Id.* at 419. Based on these documents, the Court found that no contractual relationship existed between Anchor and the government. *Id.* at 420. Although the Tri–Federal merger agreement conditioned approval upon satisfactory utilization of purchase accounting and the amortization of goodwill over a "minimum of thirty years," the FHLBB's approval, does not, without more, reflect an acceptance of these terms and conditions. The FHLBB conditional approval required Lincoln to submit "a statement of the financial condition of each association as of the effective date of the merger including footnotes on purchase accounting and an accountant's statement certifying the use of purchase accounting in accordance with GAAP." (J.A., Tab 32.) Based on documentation alone, this approval/acceptance does not grant more than what is permitted by regulation.

Unlike the Great Plains conditional approval, the Tri–Federal letter is devoid of any reference to goodwill being recorded on Lincoln's books, or forbearance from regulatory net worth requirements. By contrast, in *CalFed,* plaintiff presented evidence of a clear request for thirty-five and forty-year amortization periods for intangible assets, and the FHLBB, after negotiations, granted those periods for the relevant transactions. *CalFed,* 245 F.3d at 1345, 1347. Without more, Lincoln has not provided sufficient evidence in connection with the Tri–Federal

---

7. The method by which an acquirer accounts for its merger depends on how the merger is characterized. See Def.'s App., Tab 14 ("The purchase of assets method should be used when one of the associations is clearly dominant, and through the combination, acquires the risks and rewards of control of the other association(s)"). According-

ly, the Great Plains, Tri–Federal and Norfolk mergers were of the type which required Lincoln to account for the acquisitions under GAAP's purchase accounting. (Tr. at 42.) Therefore, defendant argues purchase accounting was not a negotiated term.

merger of specific negotiated terms that were subsequently accepted by the Bank Board. Although the Court finds that Lincoln made an offer to the FHLBB to merge with Tri–Federal under certain conditions—use of purchase accounting and amortization of goodwill over a specified period—the conditional approval does not alone reflect an acceptance of those conditions. Norfolk's conditional approval sets forth the same requirements laid out in the Tri–Federal conditional approval.[8] Similarly, the FHLBB's letter did not make any reference to goodwill or its amortization.

Recognizing that the Tri–Federal and Norfolk transactions do not have the same extent of documentary support as the Great Plains merger, plaintiff relies on the Court's analysis of the *Suess* transaction at issue in *CalFed.* The Court found that although Suess's acquisition of Equitable was less explicitly documented than the California Federal transactions, plaintiffs adequately demonstrated intent to form a contract by citing to letters, the merger application, independent accountant opinions, the FHLBB internal merger digest, and depositions and affidavits of government and bank negotiators. *CalFed,* 39 Fed.Cl. at 776.

The Court in *Anchor* was also faced with limited documentation of a possible contractual offer and acceptance. As with Great Plains, Tri–Federal, and Norfolk, the FHLBB recognized Standard's "impending insolvency" and anticipated that "merger appear[ed] inevitable." *Anchor,* 52 Fed.Cl. at 417. The FHLBB recommended approval of the merger of Standard into Anchor, and such approval was eventually granted. Anchor argued that the merger agreement, the merger application submitted to the FHLBB, and the subsequent FHLBB approval letter, coupled with the fact that the Supervisory Agent arranged a meeting between Anchor

and Standard, were sufficient to support a contractual promise by the government. *Id.* at 418. The Court, however, noted that "[n]othing about the Standard transaction suggests that plaintiff was looking for a guarantee that a change in regulations generally applicable to thrifts would not apply to Anchor." *Id.* Emphasizing the Federal Circuit's *CalFed* analysis that a "bargained-for aspect of the transaction" and "expressions of the regulators' assurances in a forbearance letter" are required to find a contractual promise, the *Anchor* Court found that, despite documentary evidence similar to *CalFed,* there was a lack of mutual intent to contract. *Anchor,* 52 Fed.Cl. at 420 (quoting *CalFed,* 245 F.3d at 1346–47.)

The juxtaposition of the FHLBB's conditional approval letters for Tri–Federal and Norfolk with that for Great Plains reveals that the FHLBB requested different compliance materials for the Tri–Federal and Norfolk transactions than for the Great Plains merger. The Great Plains' conditional approval reflected FHLBB's understanding of Lincoln's terms and conditions, as illustrated by its grant of net worth forbearance and request for a description of intangible assets, "including goodwill... to be recorded" on Lincoln's books. (J.A., Tab 18.) The conditional approvals for Tri–Federal and Norfolk merely request a statement of financial conditions of each association and an accountant letter certifying that the use of purchase accounting accords with GAAP (J.A., Tabs 32, 43), two conditions required by SP–24 (Dec. 29, 1981).[9] In addition, unlike the FHLBB's conditional approval of the Great Plains merger, there is no reference to goodwill or forbearance.

The Court has determined that although transaction documents may not contain explicit promises by the government to count goodwill toward capital requirements, the

---

8. Lincoln was required to provide within thirty days, among other documentation, "a statement of the financial condition of each association as of the effective date of the merger including footnotes on purchase accounting and an accountant's statement certifying the use of purchase accounting in accordance with GAAP." (J.A., Tab 43.)

9. SP–24 provides a guideline for determining an appropriate accounting technique for mergers of savings and loan associations. It states, in part that "[t]he applicant should furnish the specific numerical data as soon as practicable following the effective date of the merger, accompanied by an opinion of the independent accountant that GAAP has been adhered to in their determination." (Def.'s App., Tab 14.)

promise may be "subsumed" in the initial promise to permit the utilization of purchase method accounting and amortization of goodwill. *Southern California Fed. Sav. & Loan Assoc. v. United States*, 52 Fed.Cl. 531, 545 (2002); *see also Winstar*, 518 U.S. at 862, 116 S.Ct. 2432 (holding that an explicit promise to allow the use of goodwill towards capital requirements is not necessary). As the Court opined in *Home Savings of America, FSB v. United States*, "[t]he only logical reason for the inclusion in the agreements of amortization schedules is that the schedules reflect the regulatory interest of the FHLBB and the FSLIC. If there had been no understanding that supervisory goodwill would count in meeting regulatory capital requirements, there would have been no need to amortize goodwill." 50 Fed.Cl. 427, 437 (2001).

Beyond the internal FHLBB memoranda discussing the length of amortization, the "bargained-for" aspect of a contract is not readily apparent in the Tri–Federal and Norfolk mergers, nor is it conclusively established for the Great Plains merger. These circumstances place the Tri–Federal and Norfolk transactions outside the parameters of the *Suess* transaction in *CalFed*, yet do not identically parallel the situation in *Anchor*. The absence of clear evidence of acceptance by the government creates a genuine issue of material fact regarding the existence of mutual intent to contract. Without examining other factors, plaintiff has not provided undisputed evidence of bargained-for promises beyond the conventional regulatory approval process for all three acquisitions.

### Surrounding Circumstances

The Supreme Court in *Winstar* and the Federal Circuit in *CalFed* opined that surrounding circumstances may be taken into consideration when determining whether there is a contract. Contextual evidence is particularly relevant where the only communications between the parties occur during a process of regulatory approval. *Fifth Third*, 52 Fed.Cl. at 276; *see also Home Savings*, 50 Fed.Cl. at 435 (recognizing that economic circumstances assist in resolving ambiguity over whether FHLBB resolution was a contractual commitment). Evidence of negotiations can assist in discerning whether parties have ventured outside the realm of ordinary regulatory practice. *Winstar*, 64 F.3d at 1542; *CalFed*, 245 F.3d at 1345; *Fifth Third*, 52 Fed.Cl. at 277 (noting that the Court has taken evidence of negotiations into consideration when deciding on the existence of a contract).

Lincoln presents deposition testimony and affidavits of various Lincoln officers which suggests that the terms of the agreements were negotiated and agreed upon.[10] Plaintiff relies most heavily on evidence of an exchange between the parties regarding the goodwill amortization period. According to Lavern F. Roschewski, Chairman of the Board of Lincoln, "*[a]fter a series* of negotiations between Lincoln representatives and the FHLBB, Lincoln ultimately agreed with the FHLBB to proceed with the Great Plains Transaction by amortizing the goodwill created in the merger over twenty-five (25) years by the straight-line method." (J.A., Tab 24 at 4, ¶ 10; emphasis added.) Roschewski stated in his affidavit that he had also negotiated with representatives of FHLB–Topeka officials regarding the goodwill amortization in the Tri–Federal and Norfolk transactions. (J.A., Tab 24 at 4, ¶ 12.) Lincoln maintains that although the FHLBB would not agree to thirty-year amortization, plaintiff made it clear to FHLBB representatives that Lincoln "could not possibly close those transactions unless the FHLBB agreed that the amortization of goodwill would spread over at least twenty-five (25) years." *Id.*

Plaintiff bases its argument in support of mutual intent to contract on circumstantial evidence of inducement as well as transactional documentation and testimony regarding negotiations. Plaintiff maintains that the government's policy at the time of the savings and loan crisis was to induce healthier financial institutions to acquire troubled thrifts to ease the burden on the FSLIC. In the hopes of minimizing the financial burden to the government, the FHLBB preferred

---

10. See, e.g., the deposition testimony of Lavern Roschewski of Lincoln that plaintiff had a negotiated agreement with the government. (J.A., Tab 54 at 186–87.)

unassisted transactions because "it would not have cost the FSLIC any money, and the FSLIC was not that well capitalized." (J.A., Tab 25.)

Encouragement to merge was allegedly facilitated through seminars conducted by the government. Lincoln claims that it was induced to enter its three mergers as a result of one of these FHLBB-sponsored seminars. Following the seminar, the FHLBB requested that Lincoln be placed on a list for circulation at the discretion of FSLIC to associations interested in merger,[11] and Lincoln was subsequently placed on a list of potential acquirers. (J.A., Tabs 6,7.) Charles Thorne, then-President of Lincoln, testified by deposition that Lincoln was "even courted by the Federal Home Loan Bank Board to save some of those [thrifts] that were getting out of control." (J.A., Tab 55 at 38.) According to Thorne, prior to the FHLBB "courtship," Lincoln had no interest in acquiring the three thrifts. (J.A., Tab 55 at 42.) However, as the Court recognized in *Fifth Third*, "the fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate dispute as to whether it actually made such a promise." 52 Fed.Cl. at 277.

The government disputes the extent to which it was involved in the Great Plains, Tri–Federal, and Norfolk mergers. In the correspondence regarding the list of potential acquirors circulated to associations, there is no specific reference to Great Plains, Tri–Federal, and Norfolk. Plaintiff has not offered evidence other than deposition testimony to support the assertion that the FHLBB played matchmaker to the three troubled thrifts by purposely pairing them with Lincoln for merger. The government contends that Lincoln had sought merger possibilities with Great Plains prior its placement on the potential acquiror list. Lincoln's Board authorized Lincoln to proceed with its merger

transaction with Great Plains one month before the seminar and the resulting correspondence. (Def.'s App., Tab 7.) In addition, Great Plains was authorized to negotiate a merger with Lincoln as early as October 1981. (Def.'s App., Tab 6.)

Lincoln's assertions contain certain discrepancies. For instance, Lincoln claims that it had an agreement with the government enabling it to amortize goodwill for twenty-five years over a "straight line basis." *See* Pl.'s "Short Form" Mot. for Partial Summ. J. However Board Chairman Roschewski's deposition testimony indicates that the FHLBB had agreed to amortize goodwill using the "leveled-yield" method. (J.A., Tab 54.)[12] The government, moreover, cites contradictory deposition testimony. For example, when asked when Lincoln first conferred with Norfolk to discuss a merger, Delmar Williams of Norfolk stated that it was approached first in approximately in 1975, as well as several times thereafter. (Def.'s App., Tab 61.)

It is well-settled that "the Court neither may make credibility determinations nor weigh the evidence and seek to determine the truth of the matter" when resolving a motion for summary judgment. *Fifth Third*, 52 Fed.Cl. at 278; *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The difference in time periods and intentions referred to in the various depositions elicits rather than resolves questions about the circumstances surrounding the three mergers. In the absence of written documents definitively memorializing a contract, the review of other evidence and surrounding circumstances is imperative. These other factors, however, must by themselves create a clear illustration of mutual intent to contract in order for the Court to find a contractual agreement. *CalFed*, 245 F.3d at 1347. In light of the conflicting deposition testimony, the Court finds that the evidence of surrounding circumstances

---

11. The FHLBB invitation states in part, "[i]f you are interested in exploring merger possibilities with other associations, please sign the authorization below for the FSLIC and its supervisory agents to include your association's name on such a list or lists to be circulated at the discretion of the FSLIC." (J.A., Tab 6.)

12. The differences between the "level yield" method and the "straight-line" method are not inconsequential. Amortizing assets using the level yield method results in a considerably more rapid amortization schedule than the straight line method, which makes it less favorable for an acquiring institution. *First Commerce*, 53 Fed. Cl. at 44 n. 13; 3 Miller GAAP Guide 1–3.

raises genuine issues as to the level and type of governmental involvement in the three transactions. Summary judgment is therefore precluded.

### III. CONCLUSION

The Court has the discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. For the reasons discussed above, the documentation surrounding the Great Plains transaction provides the most suggestive evidence of mutual intent to contract of the three mergers. However, the government disputes the surrounding circumstances evidence with respect to all three. The Court concludes that, as in *Winstar* and *CalFed,* the most prudent course is to assess the strength of the parties' positions based on "a thorough examination of the record, including documents generated during the process of obtaining regulatory approval of the transaction[s], negotiations between the parties, and surrounding economic circumstances." *Fifth Third,* 52 Fed.Cl. at 271.

Based on the existence of genuine issues of material fact regarding the parties' mutual intent to contract, the cross-motions for partial summary judgment on liability are DENIED. The parties shall file a joint status report on or before December 6, 2002 setting forth a proposed schedule for further proceedings in this matter.

IT IS SO ORDERED.