**FIRST FEDERAL LINCOLN BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–518C.

United States Court of Federal Claims.

Nov. 6, 2003.

**364**

Edward L. Lublin, Blank Rome LLP, Washington, D.C., for plaintiff. Paul M. Honigberg and Wayne A. Keup, Blank Rome LLP, of counsel.

Gary J. Dernelle, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, for defendant. Colleen Hanrahan, Jeffery T. Infelise, and William G. Kanellis, Commercial Litigation Branch, of counsel.

### OPINION

MARGOLIS, Senior Judge.

This *Winstar*-related case is before the Court following a four-day trial on the issue of liability. Plaintiff, First Federal Lincoln Bank ("Lincoln"), alleges that the defendant, United States ("Government"), in enacting the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), breached its contract with regard to transactions with three savings and loan associations or thrifts. Specifically, plaintiff contends that it had a contract with the Federal Home Loan Bank Board ("FHLBB"), a part of the Federal Savings and Loan Insurance Corporation ("FSLIC") that was charged with regulating the transactions between thrifts.

Under the alleged contract, plaintiff claims it could count goodwill, recognized in its acquisitions of three failing thrifts, toward its regulatory capital requirements over a 25–year amortization period. Therefore, when the Government enacted FIRREA, which eliminated the use of supervisory goodwill as a means of satisfying capital requirements, it breached the contracts that existed between plaintiff and the FHLBB. The Government counters that the FHLBB was acting only in its regulatory capacity in approving the three Lincoln mergers, and that there was no contract between Lincoln and the FHLBB with respect to any future accounting treatment of goodwill. After carefully considering the evidence presented at trial and the parties' arguments, the Court finds that a contract existed between Lincoln and the FHLBB with regard to one of the three mergers at issue, and that defendant is liable to Lincoln for damages arising from the Government's breach of that contract. At the same time, however, the Court finds that no contract existed between Lincoln and the FHLBB with regard to the other two mergers.

### BACKGROUND

During the early 1980's, an unusual and unanticipated situation arose in the interest rate sensitive financial environment of the savings and loan ("S & L") industry. The history and circumstances surrounding that crisis and the enactment of the FIRREA in 1989 have been extensively discussed and, therefore, will not be revisited here. *See United States v. Winstar Corp.*, 518 U.S. 839, 844–858, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

This action is one of more than 120 cases filed that relate to that crisis and the enactment of the FIRREA. There are three transactions, all occurring in 1982, at issue here: 1) Lincoln's merger with Great Plains Federal Savings and Loan Association of Falls City, Nebraska ("Great Plains"); 2) Lincoln's merger with Tri–Federal Savings and Loan Association of Wahoo, Nebraska ("Tri–Federal"); and 3) Lincoln's merger with Norfolk First Federal Savings and Loan Association of Norfolk, Nebraska ("Norfolk"). Lincoln filed this action, claiming

that it had a binding contract with the Government, by which the Government promised to allow Lincoln to use purchase accounting in connection with the mergers and to allow Lincoln to amortize the goodwill created by the mergers over 25 years. Plaintiff alleges that the Government breached that contract by enacting FIRREA. Defendant, on the other hand, maintains that it never entered into any of the three contracts alleged by plaintiff; instead, it asserts that the only actions that the Government had with regard to those contracts were purely regulatory in nature.

The parties filed cross-motions for partial summary judgment regarding the plaintiff's breach of contract claim. In a thorough opinion, Judge Wilson denied both motions on November 19, 2002. *First Fed. Lincoln Bank v. United States*, 54 Fed.Cl. 446 (2002). Therefore, a trial on liability was held on May 19–22, 2003. Judge Wilson comprehensively covered most of the factual background and legal issues in her opinion, and this Court will not repeat them here.

## DISCUSSION

The Supreme Court has held that, when deciding *Winstar*-related cases, courts shall apply "ordinary principles of contract construction and breach that would be applicable to any contract between private parties." *Winstar III*, 518 U.S. at 871, 116 S.Ct. 2432. The Federal Circuit has opined that "[a]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *California Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir. 2001). Judge Wilson has already held that the Government representatives who were involved in these mergers had implied actual authority to bind the government. *First Fed. Lincoln Bank*, 54 Fed.Cl. at 453. Therefore, the only questions remaining are whether a mutual intent to contract and consideration for such a contract existed in each of the transactions at issue.

The Court must determine if the FHLBB was acting in a purely regulatory manner or if its actions were actually binding on the government. This is not a simple analysis because, as in all *Winstar* cases, the communications on which plaintiff relies to support the contention that it had a contract with the Government took place during a process of regulatory approval. Specifically, during this time, the FHLBB was charged with regulating the thrift industry, and thrifts, including the plaintiff, were not permitted to merge without FHLBB approval. *Fifth Third Bank of Western Ohio v. United States*, 56 Fed.Cl. 668, 670 (2003); *see also Winstar III*, 518 U.S. at 844, 116 S.Ct. 2432. The Supreme Court held, however, that in some of these transactions, the FHLBB was acting in a purely regulatory manner, while in others it acted more akin to a party to a contract. *Winstar III*, 518 U.S. at 863–64, 116 S.Ct. 2432.

As huge numbers of thrifts were failing during this time period, the Government was continually becoming responsible for a critical amount of deposit insurance liabilities. *Id.* at 845–46, 116 S.Ct. 2432. To ward off future failures, the FHLBB undertook a policy through which it encouraged healthier thrifts to merge with ailing institutions to prevent the latter from failing. *Id.* at 847, 116 S.Ct. 2432. As the acquiring parties frequently "assumed the obligations of thrifts with liabilities that far outstripped their assets," the FHLBB often induced the healthy organizations to enter into the transactions by agreeing to allow the acquiring thrifts to use favorable accounting methods, including the use of purchase method accounting, long amortization periods for the goodwill created by these transactions, and other regulatory incentives. *Id.* at 848–51, 116 S.Ct. 2432. In some instances, the Government even provided the acquiring institutions with cash subsidies also to further induce the mergers. *Winstar III*, 518 U.S. at 848, 116 S.Ct. 2432. Therefore, the Supreme Court held that the FHLBB's approval of some of these mergers went beyond regulatory action; instead, it constituted a binding contract through which a healthy thrift acquired an ailing thrift in exchange for a promise by the Government

that the acquiring thrift would be permitted to account for that acquisition in a favorable manner. *Id.* at 863–64, 116 S.Ct. 2432.

On the other hand, not "every savings and loan merger approved by the FHLBB during the period in question bound the government to a specified goodwill treatment (and was breached by the FIRREA)." *Advance Bank v. United States,* 52 Fed.Cl. 286, 288 (2002); *see also Fifth Third Bank of Western Ohio,* 56 Fed.Cl. at 695–96; *Anchor Sav. Bank v. United States,* 52 Fed.Cl. 406, 408, 420–21 (2002). "[T]he burden of proving that the reality of the transaction is a contractual undertaking, as opposed to regulatory practice, remains with the plaintiff." *First Fed. Lincoln Bank,* 54 Fed.Cl. at 452. The Court must, therefore, look at the facts of each transaction to determine if the plaintiff met its burden by showing the existence of a "bargained-for" agreement between the parties under which goodwill would continue to be treated in the manner to which they agreed even if there was a change in regulations. *Commercial Fed. Corp. v. United States,* 55 Fed.Cl. 595, 620 (2003). In doing so, the Court will look at the surrounding circumstances, including evidence of negotiations, to determine whether the "parties have ventured outside the realm of ordinary regulatory practice" and into a contractual relationship with regard to each of the transactions at issue. *First Fed. Lincoln Bank,* 54 Fed.Cl. at 457.

### 1. Lincoln and the FHLBB's Motivations for the Mergers

Although Lincoln was suffering from the troubles that were ubiquitous within the S & L industry, it was considered one of the healthier thrifts. David Douglass, the FHLBB official supervising the transactions at issue in this case, testified that "[i]f there were survivors, we thought [Lincoln] would be a survivor." Tr. 613. As the FHLBB was attempting to ward off its own future liabilities, it was encouraging healthier thrifts, such as Lincoln, to acquire some of the less healthy thrifts. The FHLBB even gave seminars, one of which was attended by Lavern Frank Roschewski, an executive at Lincoln, describing how the acquiring thrifts

may be able to use purchase accounting to account for such mergers. In fact, on November 16, 1981, Douglass sent Lincoln a letter stating that the FSLIC wanted to "circulate the names of potential acquirers to associations in need of merger partners to reduce the administrative involvement of the FSLIC in supervisory merger procedures," and requested that Lincoln authorize him to include it on the list. J.Ex. 15. As requested, Lincoln authorized its name to be included, and Douglass testified that he was "fairly confident" that Lincoln's name was actually mentioned as a potential acquirer when the FHLBB advised the ailing thrifts that they should seek merger partners. J.Ex. 16; Tr. 612.

As defendant points out, however, Lincoln had reasons, other than the FHLBB's encouragement, to pursue merging with other thrifts. Lincoln had not completely avoided the effects of the S & L crisis and was experiencing heightening losses. The management was cognizant that Lincoln's survival was in jeopardy and that it needed to find imaginative ways to survive the crisis. One of the Lincoln's survival strategies consisted of acquiring other thrifts. Roschewski testified that, in 1981 and 1982, Lincoln was "constantly looking for mergers." Tr. 403. Lincoln believed that the acquisition of other thrifts would prove financially helpful for several reasons: 1) it would provide economies of scales by broadening Lincoln's branch structure; 2) additional customers would provide a new market for sale of financial products and services; and 3) the use of purchase accounting, including the ability to amortize the goodwill created, would create "breathing room" so it could survive the crisis. Tr. 69–71. Plaintiff contends that the first two reasons alone did not make the mergers attractive enough and that it, therefore, would not have entered into any of the mergers had it not been for the Government's agreement to a 25-year amortization period. The Government maintains, however, that it never intended to be bound to such treatment for any of the transactions, and that regardless of plaintiff's motives, plaintiff has failed to provide sufficient evidence to the contrary.

## 2. Great Plains Transaction

Great Plains was another thrift that was headquartered in Nebraska. By mid–1981, it was suffering from the effects of the S & L crisis and was therefore seeking to merge with a healthier institution to avoid further losses and possible failure. By the end of October, 1981, Lincoln and Great Plains were involved in formal merger negotiations, and on December 8, 1981, they reached an agreement in principle to merge. That agreement was conditioned upon the FHLBB's "acceptance of the 'Purchase Accounting' method that will be utilized in the final consummation of the merger" and "amortization of goodwill over a minimum of 30 years." J.Ex. 19, at 4. On December 16, 1981, they entered into a definitive merger agreement that expressly incorporated, by reference, all the terms and conditions contained in the agreement in principle.

As Judge Wilson explained, "[t]he execution of the agreement was conditioned upon FHLBB approval, pursuant to the requirements of 12 C.F.R. § 546.2 (1982) (repealed)." *First Fed.*, 54 Fed.Cl. at 448. Therefore, on December 31, 1981, Lincoln submitted to the FHLBB its application to merge with Great Plains. The application included, among other things, the letter of agreement in principle, the merger agreement, and various documents relating to the anticipated use of purchase accounting. In the application and the attached documents, Lincoln requested approval of the Great Plains merger under which it would account using the purchase method. Under the purchase method, the fair values of all assets and liabilities acquired were determined as of the merger date. Any excess consideration paid by the acquiring company, over the net fair value of any identifiable assets acquired and liabilities assumed, was assigned to the asset "goodwill." The resulting thrift could count the goodwill as an asset for all purposes, including compliance with federal regulations concerning minimum capital levels. In addition, it could amortize the goodwill asset over long periods of up to 40 years. Amortization of an asset as a charge to income reflects the decrease in value of the asset over a period of time. At the same time, the acquired thrift's outstanding mortgage loans were discounted to reflect their below-market value. These loans increased in value as they approached the date at which they were repaid. Under the purchase method a resulting thrift would accrete, or add, to income this additional value. *See Winstar III*, 518 at 850–52, 116 S.Ct. 2432. In this transaction specifically, Lincoln was planning to amortize the goodwill created by the transaction on a straight-line basis over 30 years and accrete, or add to income, the loan discount by the sum-of-the-years digits method over ten years.

After reviewing the merger application, the FHLBB rejected the terms pursuant to which Lincoln proposed to account for the merger and notified Lincoln of that decision. Specifically, the FHLBB stated that it would not approve the application unless Lincoln accounted for the loan discounts and the amortization of goodwill in a manner different than that specified in the application. Lincoln was to accrete the loan discount over the contractual loan life of the acquired portfolio and that accretion was to be related to actual pre-payments received, rather than a predetermined estimate. Additionally, the FHLBB would not allow Lincoln to amortize the goodwill as originally requested and presented Lincoln with three alternative methods that, if used, would allow FHLBB to approve the application: (1) the goodwill could be amortized over 25 years on a straight-line basis; (2) the goodwill could be amortized over 40 years sum-of-the-years digits; or (3) Lincoln "could identify the separate components of the goodwill intangible . . ., amortize these balances over an acceptable shorter life, and amortize the remaining balances of goodwill over 30 years on a straight-line basis." J.Ex. 45.

Lincoln found the proposed modifications unacceptable and communicated its discontent about the situation to the FHLBB several times over the next few weeks. For instance, on March 31, 1982, Charles H. Thorne, the president of Lincoln, sent a letter to Kermit Mowbray, the president of the Topeka branch of the FHLBB, stating that Lincoln had "no other alternative but to withdraw the application based" on the modifica-

tions proposed by the FHLBB. J.Ex. 47. Lincoln followed that letter with several telephone calls and a more detailed explanation of how the proposed modifications would create an unsurmountable financial hardship. Although Lincoln was disappointed with the possibility of reducing the goodwill amortization period to 25 years, it was most concerned about the possible effects of the proposed modifications concerning the accretion of loan discounts to income and about two possible losses stemming from two of the loans that it would be acquiring and how those losses might effect Lincoln's ability to meet its net worth requirements. Therefore, Roschewski sent a letter to an FHLBB supervisory agent on April 5, 1982 that contained specific calculations demonstrating how those issues made the merger particularly unappealing. In the letter, Roschewski indicated that Lincoln "would be extremely interested in [FHLBB] acceptance" of the original method of loan discount accretion, and mentioned the possibility of "further negotiations."

On April 6, 1982, the FHLBB's Office of Examination and Supervision ("OES") recommended to the FHLBB's Office of Industry Development that it approve the merger, with some changes regarding the treatment of the accounting, because the merger would "result in the disappearance of a more serious supervisory problem, with no FSLJC assistance." J.Ex. 53. After several other discussions, Mowbray relented and told Lincoln that he would recommend FHLBB approval with the loan discounts accreted as outlined by Roschewski and with allowances made to deal with the two troubling loans. Soon after, Mowbray contacted his superiors and recommended that the merger be approved with two forbearances, one relating to the loan discount accretion and the other a net worth forbearance whereby the FHLBB agreed to forbear for five years from enforcing its supervisory powers if Lincoln failed to comply with its net worth requirements as a result of the Great Plains acquisition. To support that recommendation, Mowbray noted, among other things, that:

> The merger has taken on strong supervisory overtones as Great Plains Federal is losing about $125,000 per month and has

only 9 months to insolvency. There are few alternative in-state acquisition candidates. Even among these few candidates, we are holding several in reserve for other unassisted supervisory mergers in Nebraska. We are doubtful that we can find a better, less costly merger than the one proposed.

J.Ex. 54.

On May 5, 1982 the FHLBB approved Lincoln's application to merge with Great Plains by Resolution No. 82–322. The resolution expressly incorporated by reference the December 16, 1981 merger agreement and authorized the issuance of the two forbearances recommended by Mowbray. The resolution did not, however, specifically mention the treatment of the goodwill aside from requiring an independent accounting of intangible assets. On June 14, 1982, Lincoln provided the required accounting and other evidence that it was in compliance with the conditions set forth in the resolution. On June 23, 1982, the FHLBB informed Lincoln that it had fulfilled the conditions of the merger.

Plaintiff asserts that, when the FHLBB approved the Great Plains merger, it entered into a contract "concerning the manner in which Lincoln could account for [the] transactions and the treatment of regulatory capital, in exchange for Lincoln's promise to acquire the [thrift], including [its] negative net liabilities." Pl.'s Proposed Findings at 27, ¶ 2. Plaintiff contends that the merger application constituted an offer and that FHLBB Resolution No. 82–322 constituted FHLBB's acceptance of that offer. Additionally, plaintiff maintains that it has provided sufficient evidence to show that this was not just an ordinary regulatory action; that, instead, there were significant negotiations and the agreement was therefore a bargained-for exchange.

The Court finds that the terms of the merger approval were extensively negotiated between Lincoln and the FHLBB. After the application was submitted, the FHLBB stated that three modifications had to be made for it to be approved. Lincoln informed the FHLBB several times, both orally and in

writing, that it was disappointed in the proposed modifications, and that the merger was therefore in jeopardy unless the FHLBB agreed to a more favorable treatment. Lincoln and the FHLBB negotiated the terms, and it was decided that some of the previously required modifications were not necessary. Negotiations of this type "can indicate that the parties are embarking on more than the ordinary course of regulations." *First Commerce Corp. v. United States,* 53 Fed.Cl. 38, 42 (2002).

Defendant, on the other hand, argues that the two forbearances are not evidence of the existence of a contract concerning the treatment of goodwill, but instead are evidence of the lack of a contract on the issue. As those forbearances were unrelated to the treatment of goodwill, defendant contends that they could not be evidence of a contract on the matter. In fact, defendant maintains that "the fact that Lincoln requested concessions with regard to the treatment of loan discounts and 'scheduled items' indicates that Lincoln knew how to request regulatory concessions, and its failure to make any such requests with respect to the long-term treatment of goodwill" indicates that there is no contract relating to the treatment of goodwill. Def.'s Post–Trial Proposed Findings at 30, ¶ 8. The Court finds, however, that all the issues raised by the proposed modifications, including the goodwill amortization period, were part of the negotiations. Lincoln was unhappy with all of the proposed modifications and chose to negotiate them. The five-year difference in the amortization period was something that it was willing to accept so long as its other issues were treated more favorably. It was, however, part of the negotiated agreement.

As the terms of the merger were clearly negotiated, the Court finds that a mutual intent to contract existed concerning the treatment of the goodwill. The merger application was an offer and its approval constituted acceptance. Also, there was consideration for such a contract because Lincoln was able to acquire Great Plains using a favorable treatment and the FHLBB was relieved of a possible supervisory problem. Therefore, the Court finds that there was a valid con-

tract between Lincoln and the FHLBB in which the FHLBB agreed to allow Lincoln to amortize the goodwill created in the Great Plains merger over a 25–year period, and when Congress passed FIRREA, the Government was in breach of that contract.

### 3. *Tri–Federal and Norfolk Transactions*

■ In early 1982, the FHLBB was also concerned about the continuing viability of two other thrifts, Tri–Federal and Norfolk. During this period, Lincoln was engaged in merger negotiations with both Tri–Federal and Norfolk. On March 23, 1982, Lincoln and Tri–Federal reached an agreement in principle. That agreement was conditioned on the FHLBB's acceptance of purchase accounting, including accretion of loan discounts by the interest method with a maximum of 12 years, and the amortization of resulting goodwill over a minimum of 30 years on a straight-line basis. Lincoln and Norfolk reached agreement in principle on May 7, 1982. That agreement was also conditioned the FHLBB's acceptance of its purchase accounting method, including "the interest method of amortization of mortgage loan discounts [and] amortization of goodwill over a minimum of 25 years on a straight-line [sic] basis." J.Ex. 65.

Lincoln entered into a definitive merger agreement with Tri–Federal and Norfolk on April 15, 1982, and May 18, 1982, respectively. Both of these agreements were conditioned upon FHLBB approval and satisfactory utilization of purchase accounting. Unlike the Great Plains merger, however, neither of these agreements specifically incorporated by reference the letter of agreement in principle. On April 30, 1982, Lincoln submitted to the FHLBB its application to merge with Tri–Federal, and on June 21, 1982, it submitted its application to merge with Norfolk. The merger applications included the letters of agreement in principle, the definitive merger agreements, and financial data including notification concerning the amount of time over which Lincoln expected to amortize the goodwill.

An FHLBB supervisory assistant, Ann Frigon, recommended the approval of both mergers, noting that each thrift being ac-

quired was in financial trouble and that the mergers would help resolve those problems. Accordingly, the FHLBB issued a conditional approval of the Tri–Federal merger on June 24, 1982 and a conditional approval of the Norfolk merger on August 23, 1982. The conditions for each of those approvals, like that of the Great Plains merger, included a requirement that Lincoln submit a letter from its independent accountant discussing the accounting of the merger. Soon after each of those conditional approvals were received, Lincoln provided the requested materials and the FHLBB notified it that the conditions were satisfied.

As with the Great Plains merger, plaintiff argues that the FHLBB entered into contractual agreements with Lincoln by which the FHLBB was bound to allow Lincoln to use a favorable accounting method with regard to the treatment of the goodwill formed in the Tri–Federal and Norfolk transactions. Defendant, on the other hand, contends that the FHLBB was not contractually bound to allow this type of accounting; instead, it maintains that the FHLBB's actions with regard to the Tri–Federal and Norfolk mergers were purely regulatory in nature. Generally, the regulatory act of approval is merely a statement that the conduct approved of conforms with existing law or policy and, absent some contractual intent, no promise can be found. *Commercial Federal*, 55 Fed. Cl. at 623 (*citing Fifth Third*, 52 Fed.Cl. at 270). As defendant points out, "where a thrift merely submits an application for approval of a merger, and that application includes documentation and discussions of accounting treatments that are required as part of the regulatory approval process, the Government's approval of such an application does not constitute a contractual undertaking." Def.'s Post–Trial Proposed Findings at 27, ¶ 2. Plaintiff has the burden of showing that the "reality of [the] transaction favors construing such documents as contractual undertakings, as opposed to regulatory activities . . . ." *Commercial Federal*, 55 Fed.Cl. at 620. In this case, the plaintiff has failed to provide evidence that such a contractual undertaking was intended between the FHLBB and Lincoln with regard to either the Tri–Federal or the Norfolk mergers.

Plaintiff argues, however, that the negotiations that took place with regard to the Great Plains merger should also be viewed as negotiations for the other two mergers. Thorne testified that he viewed the Great Plains deal as a "cookie cutter deal," and that after all of the negotiations that had occurred with regard to Great Plains, there was nothing left to negotiate about with regard to the Tri–Federal and Norfolk mergers. Tr. 65. Plaintiff provides no evidence, however, that indicates that it communicated that sentiment to the FHLBB. Nor does that theory seem to match up with reality, as Lincoln did not provide the same documentation for each of the three mergers. For instance, "[t]he Great Plains merger agreement, unlike those of Tri–Federal and Norfolk, incorporated by reference, not only the necessity of utilizing the purchase method of accounting, but also the amortization of goodwill over a specific period of time." *First Fed. Lincoln Bank*, 54 Fed.Cl. at 454. Had Lincoln intended for the Great Plains merger to serve as a "cookie-cutter" for the subsequent mergers, it would have used the same boiler-plate documents. Instead, the documentation varied, with the Great Plains merger not only having more evidence of negotiations, but also having more internal evidence that the goodwill amortization period was of particular importance to Lincoln engaging in the mergers. Therefore, the Court finds that plaintiff's argument with regard to the "cookie-cutter" theory fails.

As the Court finds that there was no mutual intent to contract with regard to the treatment of goodwill in the Tri–Federal and Norfolk mergers, the enactment of the FIRREA did not cause the FHLBB to breach contracts with Lincoln with regard to those mergers.

### CONCLUSION

For the foregoing reasons, the Court finds the defendant liable for breach of contract with regard to the Great Plains merger, and the Court dismisses the breach of contract claims with regard to the Tri–Federal and Norfolk mergers.