**FIRST FEDERAL LINCOLN BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–518C.

United States Court of Federal Claims.

Nov. 15, 2005.

Edward L. Lublin, Blank Rome LLP, Washington, D.C., for plaintiff. Paul M. Honigberg, Lawrence S. Sher, and Katia I. Fano, Blank Rome LLP, of counsel.

William G. Kanellis, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, for defendant. Scott Austin, Jeffery T. Infelise, John N. Kane, Jr., and John J. Todor, of counsel.

## *OPINION*

MARGOLIS, Senior Judge.

Before the Court is defendant's motion for summary judgment as to the damages claims in this *Winstar*-related case. *See United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *First Federal Lincoln Bank v. United States*, 58 Fed. Cl. 363, 364 (2003) (*"First Federal II"*), plaintiff, First Federal Lincoln Bank ("Lincoln") alleged that the defendant, United States (the "government"), breached its contract with regard to transactions with three savings and loan associations by enacting the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183. The Court held that a contract existed between Lincoln and the government with regard to one of the three mergers, and that the government was liable to Lincoln for damages that arose from the government's breach of that contract. The Court also found that no contract existed between Lincoln and the government with regard to the other two mergers. *See First Federal II*, 58 Fed.Cl. at 370.

Plaintiff asserts two damages claims: a claim for lost profits resulting from the breach of contract, and a claim for the hypothetical cost of raising replacement capital. Defendant filed a motion for summary judgment with respect to both of plaintiff's damages claims. Defendant maintains that plaintiff's damages claims for lost profits that allegedly would have emerged from Lincoln

in the absence of the breach, and for its hypothetical cost of replacing capital are both wholly speculative claims that bear no relationship to any damages that Lincoln could recover, and must be dismissed as a matter of law. In opposition, plaintiff contends that there are genuine issues of material fact in dispute that can only be resolved at trial.

## *BACKGROUND*

The history and circumstances surrounding the 1980s savings and loan crisis and the enactment of FIRREA in 1989 have been extensively discussed and, therefore, will not be revisited here. *See Winstar*, 518 U.S. at 844–58, 116 S.Ct. 2432. This matter arises from Lincoln's 1982 supervisory mergers with three other Nebraska thrifts: Great Plains Federal Savings and Loan Association of Falls City, Nebraska ("Great Plains"), Tri–Federal Savings and Loan Association of Wahoo, Nebraska ("Tri–Federal"), and Norfolk First Federal Savings and Loan Association of Norfolk, Nebraska ("Norfolk").[1] The three transactions generated a combined total of approximately $41 million in supervisory goodwill, which pursuant to the regulatory regime in existence at the time, Lincoln was permitted to record on its books for purposes of meeting its regulatory capital requirements.

Lincoln asserts that as a result of FIRREA, it was forced to change its operating strategy from one of growth and expansion to one of contraction. After acquiring the thrifts, but before the enactment of FIRREA, Lincoln contends that it had planned to grow throughout the 1980s and 1990s.[2] The $30 million of unamortized supervisory goodwill eliminated by FIRREA represented approximately 41 percent of Lincoln's total pre-FIRREA regulatory capital. Lincoln asserts that even though the regulations permitted it to continue to count a portion of the remaining goodwill over the five year phase-out

1. A comprehensive review of the factual and legal background surrounding this case can be found in *First Federal Lincoln Bank v. United States*, 54 Fed.Cl. 446 (2002) (*"First Federal I"*), where Judge Wilson denied the parties' cross-motions for partial summary judgment regarding the plaintiff's breach of contract claim.

2. Lincoln's 1987 Strategic Plan included as a primary objective increasing total assets to $1.7 billion by December 31, 1990, and its September 1988 three-year business plan and financial projection anticipated steady growth in Lincoln's branch network.

period to satisfy minimum core and risk-based capital requirements, it could not rely on this limited, short-term asset as regulatory capital to continue to implement its long-term growth and expansion strategy. Further, Lincoln contends that although it met all of the newly mandated regulatory capital minimums in December 1989, it would not have been able to remain in capital compliance once the phasing out began of its remaining goodwill. Both the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC") expressed concern over Lincoln's ability to remain in compliance. The FDIC warned Lincoln that "an outside injection of capital may be necessary in order to maintain and achieve a level of tangible capital" higher than its "present level of capital protection," which was "deemed to be inadequate." Pl.'s Prop. Uncontrov. Facts at ¶ 50.

Lincoln contends that like many thrifts in danger of failing to meet capital requirements its two options were to reduce its assets or increase its capital. *See e.g., California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001) ("*Cal.Fed.I*"). Thus, in the fall of 1990, Lincoln's management decided to embark on a "shrink strategy" in order to continue to meet FIRREA's capital requirements. Further, in its 1992 business plan, Lincoln proposed reducing its tangible assets from $1.15 billion to $1.07 billion by December 31, 1992. This plan, directly attributed to FIRREA and the elimination of goodwill, was "a turn-around in management philosophy . . . [f]rom one of growth, branching and seeking merger acquisitions, aggressive marketing of both savings deposits and all types of lending, to one which plans reduction in size, closing branches, discontinuing equipment lending, agricultural lending, and income property lending." Pl.'s Prop. Uncontrov. Facts at ¶ 77. By enacting its "shrink strategy," Lincoln employed a number of strategies: it closed 24 branch offices in Nebraska, scaled back its marketing programs, and lowered deposit rates it paid to customers relative to its competitors.

By foregoing previously planned growth and reducing its size, Lincoln was able to increase its regulatory tangible capital from 2.42 percent as of June 30, 1990, to over 6 percent as of June 30, 1994. *Id.* at ¶ 97. In 1994, Lincoln's management developed a five-year growth plan emphasizing renewed, yet controlled growth. Throughout 1995, Lincoln took various steps toward resuming its pre-breach growth strategy and its deposits began to grow again in fiscal year 1996, eventually reaching $1.001 billion by June 30, 2000. *Id.* at ¶ 100, 103. By this time, Lincoln asserts that it had only recovered 46 percent of the approximately $300 million of deposits it lost in the six years following the breach. Further, Lincoln contends that by 1996, it had not attracted any of the deposits it would have attracted if it had been able to continue to enjoy its pre-breach Nebraska growth market share.

Lincoln filed an action in this Court, claiming that it had a binding contract with the government, by which the government promised to allow Lincoln to use purchase accounting in connection with the three mergers and to allow Lincoln to amortize the goodwill created by the mergers over a 25–year period. Plaintiff alleged that the government breached that contract by enacting FIRREA. Defendant, on the other hand, claimed that it was merely acting in its regulatory capacity. A four-day trial was held on the issue of liability. After careful consideration, the Court found that a contract existed between Lincoln and the government with regard to the Great Plains transaction, and that no contract existed between Lincoln and the government with regard to the Tri–Federal and Norfolk transactions. *First Federal II*, 58 Fed.Cl. at 364.

## DISCUSSION

### I. Expectancy Damages

 The United States Court of Appeals for the Federal Circuit has explained that the goal of expectancy damages is to give the non-breaching party the benefit it expected to receive had the breach not occurred. *See Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir.2001) ("*Glendale II*"). *See also* Restatement (Second) of Contracts § 344(a) (1981). Expectancy damages are often equated with

lost profits, which are a "recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of profit can be made." *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961). *See also Cal. Fed. I,* 245 F.3d at 1349. To recover lost profits for a breach of contract, the plaintiff must meet the following standard:

> [T]he plaintiff must establish by a preponderance of the evidence that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002) (citations omitted). The breach need not be the sole factor or sole cause for the loss of profits, but there must be a definitely established causal connection between the breach and the loss of profits. *California Federal Bank v. United States,* 395 F.3d 1263, 1268 (Fed.Cir.2005) ("*Cal.Fed.III*"). Finally, the plaintiff must be able to prove its lost profits calculation with reasonable certainty. Alleged lost profits may not be recovered if they emerge from a lost profits model that is unreliable or speculative. *See e.g., So. Nat'l Corp. v. United States,* 57 Fed.Cl. 294, 305 (2003).

### A. Dr. Kaplan's First Lost Profits Calculation

Prior to the trial on liability, Lincoln presented its damages in reports prepared by Donald M. Kaplan, Ph.D. (June 29, 2001) and S. Lynn Stokes, C.P.A. (July 2, 2001). Dr. Kaplan based his damages theory on the fact that as of December 31, 1989, the date on which the FIRREA regulations took place, Lincoln had $29,977,645 of unamortized goodwill remaining from the three mergers: $13,951,808 associated with the Great Plains transaction; $6,660,735 associated with the Tri–Federal transaction; and $9,621,302 associated with the Norfolk transaction (46.2%, 22% and 31.8% of unamortized goodwill, respectively). As a result of FIRREA, Lincoln had to exclude immediately its entire remaining unamortized goodwill from its tangible capital, and had to phase out the goodwill over five years for purposes of the core and risk-based capital. Dr. Kaplan asserted that due to the loss of its unamortized supervisory goodwill, Lincoln decided that it had to reduce its size in order to achieve the required capital ratios.

According to Dr. Kaplan, if Lincoln had not lost the $29,977,645 of goodwill it would have continued to grow throughout the 1990s, allowing Lincoln to acquire additional profitable assets. Based on his model, which calculates the profits Lincoln would have made absent the alleged government breach in all three transactions, Dr. Kaplan initially claimed that Lincoln was entitled to $66.7 million in damages for lost profits. This figure was comprised of lost profits from "foregone deposits" of $22.5 million, "liability replacement" of $1.9 million, "net cost of funds offset" of $3.1 million, "lost franchise value" of $43.1 million, and "wounded bank" damages of $2.3 million.

Dr. Kaplan calculated the amount of foregone deposits by comparing the thrift's actual Nebraska deposits to the deposits it would have had if it had not lost the supervisory goodwill from all three transactions as a result of FIRREA. As of June 30, 2001 (the assumed date of trial), Lincoln had $816 million in actual deposits. Dr. Kaplan estimates that had Lincoln been able to maintain its statewide deposit market share, its Nebraska deposits would have grown to $1.383 billion by June 30, 2001, yielding a foregone deposit amount of $567 million. To calculate lost profits from foregone deposits, Dr. Kaplan multiplied the average foregone deposits in each year through June 30, 2001, by the positive spread Lincoln would have earned by using those deposits to purchase assets. Dr. Kaplan thus arrived at lost profit damages of $22.487 million.

Dr. Kaplan increased the lost profits damages amount by $1.9 million based on the assumption that absent the alleged breach of all three transactions, Lincoln would have

added the cumulative after-tax foregone profits to its net worth and used this additional capital to pay off deposits or other borrowings rather than purchasing additional assets. Next, Dr. Kaplan reduced the lost profits figure by $3.1 million to reflect Lincoln's net lower cost of funds from reducing the deposit rates in those branches it retained. Finally, Dr. Kaplan posited that Lincoln was also entitled to recover $43.1 million in damages on the profits it would have earned on the foregone deposits in the future. According to Dr. Kaplan, this calculation approximated "the discounted present value of the net interest income, operating expenses and fee income generated by the foregone deposits in perpetuity." Kaplan Report at ¶ 76; Appendix to Def.'s Motion for Sum. Judg. at 290. Although Dr. Kaplan also calculated that Lincoln incurred wounded bank damages, costs that it otherwise would not have incurred as a result of losing its supervisory goodwill, these damages were subsequently abandoned by Lincoln. Therefore, a summary of these damages is unnecessary.

## B. Causation

In its motion for summary judgment, the government challenges Lincoln's first lost profits calculation as counterfactual, speculative, and too flawed to provide a reasonably certain measure of damages. First, the government contends that Lincoln was never in danger of falling out of compliance due to the phase out of all of the goodwill, including the goodwill from the non-contractual transactions.[3] The government states that at no point was Lincoln out of capital compliance and that Lincoln itself projected that it would continue to meet the regulatory capital levels in the future. While Dr. Kaplan opined that if Lincoln had not employed its shrink strategy, it would have been in capital compliance trouble and could possibly have been seized by regulators at some point in the future, the government asserts that this opinion is unsupported by the record, and is no more than a guess made without any meaningful supporting analysis.

Second, the government contends that Lincoln's lost profits model does not adequately address the regulatory capital eliminated by non-breaching provisions of FIRREA. The government asserts that Lincoln's pre-FIRREA regulatory capital included non-breach related components of capital that were eliminated by FIRREA, which would have also had a consequential impact on Lincoln. The government points out that these significant portions of Lincoln's regulatory capital would have been eliminated in any event, yet Dr. Kaplan's model fails to account for this fact. For example, Lincoln's $71.4 million of pre-FIRREA regulatory capital included $11.1 million in general valuation allowances ("GVAs") and $1.2 million in appraised equity capital, accounting for over 17 percent of Lincoln's pre-FIRREA regulatory capital. Under FIRREA, GVAs were entirely excluded from tangible and core capital, and appraised equity capital was excluded from tangible, core, and risk-based capital. Defendant contends that Dr. Kaplan makes no attempt to determine what actions Lincoln would have avoided taking in the "no breach" world to account for the exclusion of GVAs and appraised equity capital, and as a result, his damages are speculative. Further, defendant asserts that the fact that Dr. Kaplan completely ignores the consequential impact on Lincoln's regulatory capital caused by the elimination of GVAs and appraised equity capital renders his damages overstated and therefore unreliable.

Next, the government challenges Dr. Kaplan's "foregone deposits" figure as being unsupported by the record. The government points to the fact that this figure relies on the assumption that Lincoln would have maintained its 1990 market share in the Nebraska deposit market through at least June 2000, when in reality, Lincoln's market share was in a state of decline well before Lincoln allegedly began to respond to the provisions of FIRREA. The government asserts that Lincoln's actual deposits were also declining prior to 1990, yet Dr. Kaplan offers no evidence to support his underlying assumption

---

3. Defendant cites to the July 30, 1990, OTS Report of Examination, where OTS noted that tangible and core capital compliance was pro-

jected to be maintained throughout the phase-out period, even assuming "no net income." Appendix to Def.'s Motion for Sum. Judg. at 26.

that Lincoln would have stopped this trend. Defendant contends that Dr. Kaplan's "opinion that [Lincoln] would suddenly reverse course, and maintain its deposit market share absent the breach, is speculative and unsupported, and accordingly, the projections of additional profit that would flow from this growth are unsupportable." Def.'s Motion for Sum. Judg. at 48.

With regard to the branch closures, the government asserts that plaintiff's original lost profits model fails to consider the fact that Lincoln's need to improve its net interest margin and reduce its operating expenses were the decisive factors that drove Lincoln toward shrinkage. Defendant contends that the lost profits model ignores the economic reasons for closing the 24 Nebraska branches, and that Dr. Kaplan provides no basis to conclude that these branches would not have been closed absent the breach. Further, the government characterizes the damages calculation as speculative because Dr. Kaplan assumed that the deposits from the closed branches would have grown at the same average as aggregate deposits in all other depository institution branches in Nebraska. Defendant contends that in reality, Lincoln had concluded that these branches were unprofitable and had poor long-term economic potential. In addition to these economic realities, defendant asserts that Dr. Kaplan also ignored increased competition in the Nebraska deposit market, and that his disregard for the impact competition would have had on Lincoln's ability to grow and maintain its market share renders his entire calculation speculative.

In response, plaintiff asserts that summary judgment must be denied because the factual assumptions underlying its lost profits claim are supported in the record by its actual pre- and post-FIRREA business plans, board minutes, financial documents and operating history. Plaintiff argues that the determination of lost profits damages involves intensely factual evaluations and is generally not susceptible to resolution by summary judgment. Plaintiff claims that the majority of opinions in this Court have refused to grant summary judgment for the defendant on *Winstar* damages claims. *See e.g., Anchor Sav. Bank v.*

*United States,* 59 Fed.Cl. 126, 147 (2003); *Globe Sav. Bank, F.S.B. v. United States,* 59 Fed.Cl. 86, 92 (2003); *Citizens Federal Bank, F.S.B. v. United States,* 52 Fed.Cl. 561, 567 (2002). Lincoln also asserts that this Court has "not ... barred as a matter of law the use of expectancy/lost profits theory." *Glendale Federal Bank v. United States,* 378 F.3d 1308, 1313 (Fed.Cir.2004) ("*Glendale IV*"). Plaintiff contends that causation is a question of fact, which is inappropriate for decision on summary judgment. *See Cal. Fed. I,* 245 F.3d at 1350. Plaintiff further asserts that the government has failed to satisfy its burden of demonstrating the absence of genuine issues of material fact with respect to causation.

Plaintiff characterizes the following as genuine issues of material fact: whether Lincoln needed to forego assets to stay in capital compliance; whether the breach versus other economic factors was a substantial factor causing Lincoln to shrink its assets and close 24 Nebraska branches; and whether Lincoln's Nebraska deposit market share would have increased or decreased absent the breach. Lincoln maintains that the proper inquiry is not which specific branches Lincoln would have closed or which specific deposits from which branches it would have allowed to run off but for the breach, but rather, "whether the government's breach was a substantial factor in causing Lincoln to reduce its deposits from $1.61 billion to $896.8 million between 1991 and 1994, and to forego substantial deposit growth." Pl.'s Opp. at 28. With regard to the GVAs and the appraised equity capital, the plaintiff argues that it is not required to prove the specific actions it would have avoided taking in the "no breach" world to account for the exclusion of GVAs and appraised equity capital. Plaintiff asserts that neither the Federal Circuit nor this Court requires that degree of specificity and instead, it need only establish that, but for the breach, it would have earned additional profits. *Commercial Federal Bank, F.S.B. v. United States,* 59 Fed.Cl. 338, 349 (2004).

Further, plaintiff asserts that its lost profits damages model satisfies the test for reasonable certainty as it need only establish a

reasonable probability of damage, and that uncertainty as to the amount will not preclude recovery. *Bluebonnet Savings Bank, F.S.B. v. United States,* 266 F.3d 1348, 1356–57 (Fed.Cir.2001). Lincoln cites to *Cal. Fed. I,* where the bank's damages claim was based on profits lost due to the sale of nearly 25,000 single family adjustable-rate mortgages that it sold as a result of FIRREA. There, the bank's expert traced the post-sale performance of these loans to determine the bank's damages. Lincoln notes that the Federal Circuit held that the bank's proffer of evidence more than sufficed to defeat summary judgment, and that the court did not require the bank to present evidence of specific loans sold and their amounts. *Cal. Fed. I,* 245 F.3d at 1349–50. Plaintiff argues that unlike *Cal. Fed. I,* the government advocates a much more stringent standard of proof, one that requires plaintiff to characterize its post-FIRREA actions with more specificity than is actually required.

Plaintiff cites cases in which the Court denied the government's summary judgment motion on lost profits because the expert's calculations were supported by the thrift's pre-breach history and post-breach operations. *See e.g., Long Island Sav. Bank, F.S.B. v. United States,* 60 Fed.Cl. 80, 91–92 (2004); *Globe Sav. Bank,* 59 Fed.Cl. at 92–96. Plaintiff also points to *Commercial Fed.,* where the Court held that just because the lost profits model employed a process of projection, it was not legally deficient. 59 Fed.Cl. at 344–51. Plaintiff asserts that it is sufficiently specific to build a lost profits model on the company's previous and subsequent experience. With such information, the court can draw reasonable inferences about the plaintiff's ability to earn profits in a non-breach world.

### C. Dr. Kaplan's Adjustment to the Lost Profits Calculation

This Court's November 6, 2003 liability decision held that the Great Plains transaction constituted a breach of contract while the Tri–Federal and Norfolk transactions did not constitute a breach of contract. *First Federal II,* 58 Fed.Cl. at 370. The goodwill from the Great Plains transaction amounted to 46 percent of the total goodwill emerging from all three transactions. As a result of the liability decision, Dr. Kaplan reduced the original lost profits claim to 46 percent of the $66.7 million in lost profits damages. Consequently, Lincoln's reduced lost profits damages claim is $29.6 million (after elimination of the wounded bank damages). The government maintains that Lincoln's revised lost profits damages is inadequate as a matter of law because a "pro-rata" reduction is a meaningless analysis that does not measure profits in a "no-breach" world. Defendant asserts that there is no methodology behind merely multiplying the original damages figure by 46 percent, and that the absence of any meaningful analysis entitles defendant to summary judgment.

First, the government points out that Dr. Kaplan repeatedly asserted that he could not address what Lincoln would have done in the "but-for" world where it was permitted to count the $14 million from the Great Plains transaction toward its capital requirement. The government highlights that during his deposition, Dr. Kaplan stated that he lacked adequate information to determine what Lincoln would have done if it were permitted to apply the Great Plains goodwill toward its capital requirement. Further, he stated that he had not done a new analysis to determine what Lincoln would have done in the but-for world because to do a new analysis would be unnecessary, long, and expensive. Dr. Kaplan claimed that, in his view, doing a new analysis and employing a pro-rata reduction would have achieved the same result. The government asserts that Dr. Kaplan's conclusion is legally irrelevant because his analysis does not compare Lincoln's actual earnings and what it would have earned had it been able to count the $14 million toward its capital requirement.

Defendant argues that plaintiff has failed to engage in the most basic inquiry required for its lost profits claim. Defendant asserts that Dr. Kaplan failed to analyze which of the 24 Nebraska branches were closed due to the breach, how many additional deposits Lincoln would have carried but for the breach, how or to what degree Lincoln curtailed its marketing because of the breach, what its fran-

chise premium would have been but for the breach, and how many additional deposits would have been generated and at which branches, had the breach not occurred. Although Dr. Kaplan may have analyzed these factors in the but-for world where the government breached all three agreements, defendant contends that he has failed to carry out a similar analysis in the but-for world where the government only breached the Great Plains agreement.

Plaintiff, on the other hand, contends that the percentage reduction in damages fairly estimates lost profits due to the Great Plains transaction, and at the very least, raises genuine issues of material fact which can only be resolved at trial. Plaintiff argues that there is no legal prohibition on using a pro-rata reduction in total damages to conform to rulings on liability. Further, Lincoln defends Dr. Kaplan's percentage reduction by explaining that after the supervisory mergers in 1982, all of the goodwill was recorded on Lincoln's books and included in its regulatory capital. At this point, the goodwill became indistinguishable, and the origin of each dollar of goodwill was irrelevant to Lincoln or its regulators. Lincoln contends that after FIRREA took effect, Lincoln took measures to counteract the effects of the loss of all of the goodwill, not just the goodwill from the Great Plains transaction, by closing branch offices and reducing interest rates. Thus, asserts Lincoln, any attempt to distinguish legal concepts such as contractual versus non-contractual supervisory goodwill, separate and apart from the actual loss of all of the supervisory goodwill, would be futile. Plaintiff asserts that Dr. Kaplan could have calculated a new but-for world, but he determined that such an exercise would be unnecessary and would lead to the same general result as a percentage reduction.

### D. Analysis

■ The Federal Circuit and this Court have consistently held that uncertainty as to the amount of damages will not preclude the non-breaching party from recovering from the government. *See, e.g., Bluebonnet,* 266 F.3d at 1356–57; *Cal. Fed. I,* 245 F.3d at 1349. In *Bluebonnet,* the Federal Circuit

stated that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." 266 F.3d at 1355 (internal quotations omitted). Similarly, in *Cal. Fed. I,* the Federal Circuit quoted the Court of Claims' position that lost profits are a recognized measure of damages where "there is some basis on which a reasonable estimate of the amount of the profit can be made." 245 F.3d at 1349 (*quoting Neely,* 285 F.2d at 443).

The Court finds Dr. Kaplan's model to be similar to plaintiff's lost profits model in *Commercial Fed.* In *Commercial Fed.,* following a trial on damages, the court awarded the plaintiff damages based on a lost profits model that "use[d] a process of projection" based on the "actual performance of the bank both pre-FIRREA and post-conversion." 59 Fed.Cl. at 351. There, the court held that the lost profits model adequately demonstrated that the plaintiff had engaged in a shrink strategy as a direct result of FIRREA, "and that the resulting depletion of plaintiff's assets deprived plaintiff of profits it would have earned in the but-for world." *Id.* at 350. While plaintiff's lost profits model did not identify the actual amounts of assets sold, the model assumed that plaintiff would have been able to grow its assets at a particular annual rate. *Id.* at 344. Further, the model extrapolated plaintiff's profits based on actual previous earnings, and pointed to opportunities that would have been pursued had capital been available. *Id.* at 344–45, 349 n. 29. The court held that even though the model relied on a process of projection, because the amount of lost profits was based on the actual performance of the thrift both pre– and post-FIRREA, the court was able to draw reasonable inferences from the evidence about the profits plaintiff would have earned but for the breach. *See id.* at 351. The Federal Circuit subsequently affirmed the court's decision for plaintiff in a *per curiam* opinion. *See Commercial Federal Bank, F.S.B. v. United States,* 125 Fed. Appx. 1013 (Fed.Cir.2005).

Like the lost profits model in *Commercial Fed.*, Dr. Kaplan's model relies on a process of projection that is grounded in Lincoln's actual performance, both pre– and post-FIRREA. Lincoln has presented evidence that before the enactment of FIRREA, Lincoln had embarked on an aggressive growth strategy that included the goals of expanding its existing branch structure, increasing its assets and increasing its regulatory net worth. Subsequently, after the enactment of FIRREA, the OTS and FDIC expressed concern over Lincoln's capital levels. In order to meet capital requirements, Lincoln's management identified controlling the growth of the institution and reducing its size through shrinkage and consolidation as primary strategic goals. As a result, Lincoln alleges it discontinued very profitable programs, closed branches, reduced deposits, and centralized operations. Based on the actual performance of the thrift both pre– and post-FIRREA, Dr. Kaplan was able to project the amount of deposits and assets that Lincoln would have earned, but-for the breach of the Great Plains transaction. Further, Dr. Kaplan's model relies on the assumptions that Lincoln would have maintained its 1990 market share and that the deposits from the closed branches would have grown at the same average as the deposits in all other depository institution branches in Nebraska. Similar to *Commercial Fed.* and *Energy Capital Corp.*, 302 F.3d at 1329, this is a case in which the court can properly draw reasonable inferences based upon the evidence about the likelihood that plaintiff would have earned profits in the amounts specified but for the breach. *Commercial Fed.* 59 Fed.Cl. at 351 (citations omitted).

Moreover, as in *Cal. Fed. I*, Lincoln has presented evidence of a specific business opportunity it was unable to pursue as a result of its post-FIRREA capital levels. On December 6, 1989, Lincoln submitted a bid to the Resolution Trust Corporation ("RTC") to purchase five branches of a failed thrift. While RTC initially accepted Lincoln's bid, Lincoln claims that the OTS ultimately excluded Lincoln from the bidding process based on its inadequate tangible and risk-based capital ratios.

Additionally, summary judgment for the defendant on Lincoln's lost profits claim cannot be granted because Lincoln has presented evidence that there are genuine issues of material fact in dispute as to causation. While the government contends that other non-breach factors affected Lincoln and would have done so in the non-breach world, Lincoln has presented conflicting evidence as to this material issue. This evidence includes statements from Lincoln's management that it would not have shrunk its size without the loss of goodwill, as reflected in various pre– and post-FIRREA Strategic Plans. Similarly, while the government contends that Lincoln was never in danger of failing to meet FIRREA's capital requirements and did not need to reduce assets to stay in compliance, Lincoln has also presented conflicting evidence as to this material issue. Specifically, Lincoln has presented evidence that both the OTS and FDIC expressed concern over Lincoln's capital requirements after the enactment of FIRREA.

Finally, whether or not Dr. Kaplan's pro-rata reduction was an appropriate response to the Court's liability decision is a genuine issue of material fact. Whereas plaintiff argues that Dr. Kaplan's approach to reducing plaintiff's lost profits claim is reasonable and produces an accurate estimation of lost profits, the government asserts that it is meaningless, legally irrelevant, and fails to address the difference between Lincoln's actual earnings and what it would have earned had it been able to count $14 million of the remaining Great Plains goodwill toward its capital requirement. In a motion for summary judgment, it is not the Court's function to weigh the evidence. At this stage of the proceedings, the Court cannot resolve such an intensively and inherently factual disagreement. Whether or not Dr. Kaplan's approach produced an accurate estimation of lost profits that accounts for the Court's liability ruling can only be resolved at trial. Accordingly, this Court denies the government's motion for summary judgment as to lost profits damages.

## II. Cost of Replacement Capital

■ Plaintiff asserts that as an alternative to lost profits, the government should be

required to repay plaintiff the value of supervisory goodwill that Lincoln lost as a result of the government's breach of contract. Plaintiff's theory purports to measure Lincoln's costs if it had chosen to replace the goodwill eliminated by FIRREA with tangible capital. In plaintiff's words, the "present-value or discounted cash-flow model" is designed to "measure the cash equivalent of the lost supervisory goodwill capital by calculating the cash payment the government would have had to pay Lincoln on the date of the breach, to leave Plaintiff in the same position as if there had never been a breach." Pl.'s Memo Conc. Dam. at 15. The model forecasted a but-for world where Lincoln issued preferred stock in an amount corresponding to the goodwill phased out by FIRREA and was specifically designed to mimic the key characteristics of the lost supervisory goodwill, including its characteristic as a non-earning asset that amortized over time. Following this Court's liability ruling, Dr. Kaplan posited that the value of the Great Plains goodwill was $6,055,000, as of the date of the breach. He estimated transaction costs of $674,000 and then adjusted the amount to the presumed date of the trial (December 31, 2001) by adding an additional $6,381,000. Consequently, Dr. Kaplan opined that the cost of replacement capital equaled $13.1 million.

The Federal Circuit has endorsed the use of a replacement capital calculation, recognizing that " 'the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill.' " *LaSalle Talman v. United States*, 317 F.3d 1363, 1374 (Fed.Cir.2003) (*quoting LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 103 (1999)). Cost of replacement capital models based upon purely hypothetical undertakings, however, have almost been uniformly rejected as a matter of law. *See e.g., Globe Sav. Bank*, 59 Fed.Cl. at 96; *Long Island Sav. Bank*, 60 Fed.Cl. at 96; *Glendale Bank*, 43 Fed.Cl. at 401–02; *Columbia First Bank v. U.S.*, 54 Fed.Cl. 693, 699–700 (2002); and *Fifth Third Bank of Western Ohio v.*

*United States*, 55 Fed.Cl. 223, 243–44 (2003) (*"Fifth Third I"*). On the other hand, the court has found cost of replacement capital models to satisfy the requirement of reasonable certainty when the models are based on actual, not hypothetical stock offerings. *See Home Sav. of America, F.S.B. v. United States*, 57 Fed.Cl. 694, 728 (2003).

Plaintiff cannot recover damages under a cost replacement theory for goodwill it never attempted to replace. In *Anchor Sav. Bank*, the court rejected plaintiff's hypothetical cost of replacement model because rather than attempting to replace the capital, the thrift pursued another strategy. 59 Fed.Cl. at 159. There, the court stated that "plaintiff's damages can and should be based on these actual undertakings, rather than on a speculative model based on an event that never took place." *Id.* Further, the court held that summary judgment was appropriate to apply to the plaintiff's hypothetical model, as have many other judges in this court. *Id. See also Fifth Third I*, 55 Fed.Cl. at 243–44; *Columbia First Bank*, 54 Fed.Cl. at 699–700.

Defendant asserts that cost of replacement capital models based upon hypothetical undertakings do not satisfy the criteria of causation, reasonable certainty, and foreseeability. Defendant asserts that summary judgment is appropriate because plaintiff's cost of replacement model fails because: (1) at the time of the breach, Lincoln was a mutual stock association and could not raise capital by issuing preferred stock; and (2) Lincoln did not attempt to replace the Great Plains goodwill. Defendant points out that recently, the Federal Circuit rejected a plaintiff thrift's cover damages theory for identical reasons. *See Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1237 (Fed.Cir.2005) (*"Fifth Third II"*). *See also Granite Management Corp. v. United States*, 416 F.3d 1373, 1381–82 (Fed. Cir.2005).

Like the thrift at issue in *Fifth Third II*, Lincoln did not issue preferred stock to replace capital, and as a mutual stock association at the time of the breach, could not do so. Lincoln's actions are different from the thrift's actions in *Home Sav. of America,*

*F.S.B. v. United States,* 399 F.3d 1341, 1353–54 (Fed.Cir.2005), a case brought to the Court's attention by Lincoln. There, unlike Lincoln, the thrift did in fact raise replacement capital. *Id.* Because plaintiff's hypothetical cost of replacement model is based on a strategy Lincoln never actually pursued, the Court grants the government's motion for summary judgment on the plaintiff's claim for cost of replacement capital.

## CONCLUSION

For the foregoing reasons, the court DENIES defendant's motion for summary judgment with respect to plaintiff's damages claims for lost profits, and GRANTS defendant's motion for summary judgment with respect to plaintiff's damages claims for the cost of replacement capital.

